OPINION
The present appeal centers on the issue of coverage for a "second permittee" under an omnibus clause in an insurance policy issued by Indiana Insurance Company to White Allen Chevrolet. In this regard, the pertinent facts are as follows. In July, 1995, Laura Combs and her husband, James, purchased a 1995 C1500 Chevrolet Pickup truck from White Allen. Because James' credit was poor, the original application for financing in both James' and Laura's names was rejected. Subsequently, the loan was resubmitted under Laura's name only and was approved. During the financing process, White Allen verified that Laura had motor vehicle insurance. However, James did not have a driver's license and he was specifically excluded from coverage under his wife's insurance policy. White Allen does not appear to have been aware of these latter facts.
When the Combs took possession of the truck, they showed Richard Sloan, White Allen's new truck sales manager, some damage that had been done to the truck during the time it sat on the lot. Consequently, as part of the sale, White Allen agreed to fix the damage. Sloan also told the Combs they would be given a loaner vehicle while their truck was being repaired. According to Sloan, White Allen's general procedure for providing customers with loaner vehicles is to have the customer fill out a loaner agreement. The agreement that White Allen used at the time contained spaces for various information, including the name of the driver to whom the vehicle was loaned, the driver's license number, and the insurer or insurance agent. Additionally, the form stated as follows:
Notice to Customer
 There is no liability insurance, comprehensive or collision insurance on this vehicle. This vehicle is loaned as a temporary vehicle for local use only (i.e., not to exceed 30 mile radius of dealership). Gas is not provided. This vehicle is only to be operated by above named driver.
Below this notice were spaces for the signatures of a White Allen manager and the customer.
On July 31, 1995, Laura and James brought their truck back for the needed repairs. Sloan was not present at the time and no loaner agreement was signed. However, James Combs told an employee in the body shop that he had been promised a loaner vehicle. This employee then asked another manager for an available vehicle. The employee was given a set of keys to a 1995 Chevy Blazer and passed the keys along to James. No loaner agreement was signed, as the employee was not aware that such agreements were used.
Laura Combs left before James was given the keys, as she had to go to work. Nothing was said by White Allen about who could drive the Blazer. Ironically, while all the White Allen employees said that both Laura and James Combs had permission to drive the Blazer, James Combs testified that he did not believe he had permission from White Allen to use the Blazer. Instead, he concluded that his wife, Laura, was the one who had permission. His conclusion was based on the fact that the other truck and the insurance were both in Laura's name.
According to James, he drove the Blazer to his house from White Allen, parked it, and did not drive it again. Laura used the Blazer a few times, and also gave James' sister, Andrea, permission to use it to take James back and forth to work. Further, Laura gave Andrea permission to use the Blazer to run errands for Laura, James, or their children, and to use the truck on Andrea's own behalf.
On the day of the accident, James and Andrea were at their parents' home in Moraine, Ohio, and the Blazer was parked in the driveway. At some point during the afternoon, Andrea's boyfriend, Josh Campbell, came to the house. Campbell worked on the assembly line at a General Motors' plant which manufactured Chevy Blazers. Some dispute exists about what occurred after Campbell arrived. Campbell maintained that he admired the Blazer and asked James if he could test-drive it because he had not yet driven the brand new model. Allegedly, James told him to "go ahead," and also told him that the keys were in the truck. By contrast, James denied giving Campbell permission to use the Blazer. According to James, Campbell said only that the Blazer was "nice," and that he was going out to look at it. At that point, James went into the bathroom or bedroom. When he came back out, the Blazer was gone. The only other person in the house, Andrea, testified that she was using the telephone and did not know whether permission had been given or not.
Shortly after Campbell left the house, he and the Blazer were involved in an accident that resulted in Marva Dillard's death. Dillard's administrator then filed suit against Campbell, Combs, and White Allen. Indiana Insurance, in turn, filed suit against Campbell for damages done to the Blazer. As a defense, Campbell claimed he was a permissive user and was insured under the policy of insurance issued to White Allen.
At the time of the accident, Indiana insured White Allen under a commercial general liability policy of insurance. Under the Commercial Auto Coverage Part, Garage Coverage Form Declarations, Indiana provided White Allen with $1,000,000 liability coverage for "each accident" and "garage operations." Under "Garage Operations" — Covered "Autos," Indiana agreed to pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" * * * caused by an "accident" and resulting from "garage operations" involving the ownership, maintenance or use of covered "autos." The policy further defined "insureds" for covered autos as the named insured, anyone else using a "covered auto" with the permission of the named insured, and customers of the named insured, but only up to Ohio's minimum compulsory or financial responsibility law limits.
After reviewing the facts and applicable law, the trial court granted summary judgment in favor of Indiana. In particular, the court found that Campbell's use of the truck, as a sub-permittee or second permittee, was not covered under the omnibus (or extended coverage) clause, as such clauses have been interpreted by Ohio courts. Dillard's administrator and Campbell, whose interests are aligned on this issue, now appeal from the trial court's decision and raise the following assignment of error:
I. The trial court erred in granting Indiana's Motion for Summary Judgment as there were genuine issues of material fact on which reasonable minds could differ as to whether White Allen had given implied in fact permission to Combs to further delegate the use of the Blazer to another and as to whether Campbell's use of the vehicle was for some purpose, benefit or advantage of White Allen or Combs.
Upon consideration of the single assignment of error, we find it without merit and affirm the judgment of the trial court. A brief discussion of our opinion follows.
 I
In support of their assignment of error, Dillard and Campbell make two primary arguments. First, they contend that James Combs had "implied-in-fact' permission from White Allen to delegate the use of the Blazer to another. In this regard, they claim that because James Combs was the individual who picked up the Blazer, White Allen knew that at least one "sub-permittee," i.e., Laura Combs, would be driving the truck. From this, Dillard and Campbell reason that James Combs had implied permission from White Allen to allow other "sub-permittees" to use the truck. Their second argument in support of coverage is that Campbell's use of the Chevy Blazer was of benefit to White Allen or Combs.
As an initial point, we note that our review of a lower court's award of summary judgment is "de novo without deference to the trial court's determination." Mueller v. Taylor Rental Ctr. (1995), 106 Ohio App.3d 806, 809 (citations omitted). Therefore, the issue for our consideration is whether genuine issues of material fact precluded summary judgment on behalf of Indiana Insurance. We find that they did not. Although a factual dispute existed regarding whether James Combs gave Josh Campbell permission to use the Chevy Blazer, that dispute was not material. Assuming for purposes of argument that Campbell had permission, White Allen neither expressly nor impliedly authorized Campbell's use of the truck.
In West v. McNamara (1953), 159 Ohio St. 187, the Ohio Supreme Court noted that the vast majority of jurisdictions have accepted the following general principles regarding permissive use and omnibus clauses:
 "1. The original permittee who has been given permission to use the automobile can delegate this authority to the second permittee so as to bring the use of the automobile by this person within the protection of the policy if permission has been expressly given by the named insured to make such delegation.
 2. The original permittee who has been given permission to use the automobile but has been expressly forbidden to delegate this authority cannot do so, and the use of the car by the second permittee in violation of the named insured's express order is not within the protection of the policy.
 3. The original permittee who has been given permission to use the car cannot, according to the great weight of authority, delegate this authority to the second permittee so as to bring the use of the car by that person within the protection of the policy where the initial permission is silent as to the question of delegation of authority.
 4. The initial permission given by the named assured to the original permittee includes, according to the better view, the use of the automobile by the second permittee where in doing so the second permittee serves some purpose, benefit, or advantage of the first permittee. This is the case if the original permittee is riding in the car * * * or if the car is driven in his interest or for a purpose mutual to him and the second permittee * * *."
Id. at 193-94 (citation omitted).
The present case falls within the third paragraph quoted above, because the initial permission from White Allen to Combs was silent on the issue of delegation of authority to use the truck. Under our reading of controlling authority, White Allen's silence prevented James Combs from giving Campbell authority to use the truck. By arguing that Combs had implied permission to delegate, Dillard and Campbell appear to be attempting to fit within an exception or qualification that some cases have applied. For example, in Security Mut. Cas. Co. v. Hoff (1978), 54 Ohio St.2d 426, a father prohibited his son (the first permittee) from allowing anyone else to use a car insured by Ohio United Insurance Company. The son then allowed his girlfriend (the second permittee) to drive the car, and an accident took place. According to the testimony in the case, the son's mother, who was also a named insured on the policy and the owner of the car, knew the girlfriend had driven the car prior to the accident. However, instead of admonishing the son or his girlfriend, the mother remained silent. Under these circumstances, the court found that the trier of fact properly considered whether the express prohibition had been revoked and whether implied permission had been given for the second permittee to operate the car. Id. at 429-30.
Similarly, we recognized in Collins v. Fessler (Dec. 5, 1983), Miami App. No. 83 CA 20, unreported, that "`permission' is a question of fact which * * * [can] be implied from the circumstances as well as express." Id. at p. 2. However, despite this recognition, we declined in Collins to find permissive use on the part of a second permittee. Our decision was based on two factors. First, the policy itself indicated that permission of the named insured was required. Id. at p. 3. Therefore, by definition, the first permittee could not have given permission, since he was not a named insured. As a second point, we found no indication that the named insured gave permission. In this regard, we noted that "[t]he permission given by the permittee to the third party should not be imputed to the named insured absent facts indicating his acquiescence or ratification." Id.
Like the policy in Collins, the Indiana Insurance policy issued to White Allen restricts coverage to persons using a covered auto with the permission of the named insured. Specifically, the policy defines "insured" as "[a]nyone * * * using with your permission a covered auto." The policy further indicates that "you" or "your" refers to the named insured. Consequently, Combs was not a person who could give permission under the policy. Furthermore, the undisputed facts do not reveal any acts on White Allen's part acquiescing in or ratifying Combs' delegation to a second permittee. In contrast to the situation in Security Mut. Cas. Co. v. Hoff, White Allen did not know of Campbell's use of the Blazer and had no chance to acquiesce in or ratify his use.
In this context, we note that the explanation of events suggested by Dillard and Campbell is simply not supported by the depositions and affidavits. Contrary to their suggestion, there is no evidence that anyone considered Laura Combs a "sub-permittee" of James Combs. Instead, both Laura and James Combs were initial permittees. Laura, not James, was the obligor on the loan, and she was also the owner of the truck that was brought in for repair. White Allen's manager testified that both Laura and James came in to take possession of the truck they purchased, and that he talked to them (in the plural) about the repairs and the loaner vehicle. On the day that the loaner vehicle was obtained, both Laura and James came in to the dealership. Although Laura left to go to work before she or her husband actually got the keys to the truck, there is no indication that anyone from White Allen considered James the sole permittee for the loaner vehicle. In fact, the White Allen employee who handled the transaction testified that either Laura or James was allowed to drive the truck.
As an additional point, the testimony of both James Combs and his sister, Angela, indicates that, if anything, Laura was the primary permittee. Specifically, James said that he knew he was not supposed to drive the Blazer. According to James, he drove the vehicle only from White Allen to his house, parked it, and did not drive it thereafter. Likewise, Angela testified that Laura exercised control over the vehicle and gave Angela permission to use it to take James back and forth to work. The basis for both James' and Angela's understanding on this point was James' lack of a drivers' license. Accordingly, we find no merit in the claim that White Allen knew Laura Combs would be a sub-permittee and thus gave James Combs implied permission to delegate authority to other sub-permittees. Furthermore, even if we could find evidence that Laura Combs was a sub-permittee, we see no logical connection between such a fact and delegation of a loaned automobile to third parties outside the family relationship. In other words, the fact that an initial permittee may allow a spouse to use a loaned vehicle does not in any way imply that he will, therefore, allow others to use the vehicle.
As was noted above, the second argument in favor of coverage is that Campbell's use of the Chevy Blazer was of benefit to White Allen and/or James Combs. This is an attempt to invoke an exception noted in West, i.e., that coverage under the omnibus clause will apply if the second permittee's use of the vehicle is of some benefit or advantage to the first permittee. West,157 Ohio St. at 194. See also, e.g., Jackman v. Cincinnati Ins. Co. (1987), 41 Ohio App.3d 149 (rejecting exception where express prohibition against second permittee's use exists, even if use is beneficial to first permittee); Drake v. State Farm Ins. Co. (Oct. 15, 1998), Cuyahoga App. No. 73502, unreported (allowing coverage where first permittee was intoxicated and was being driven home by second permittee); and Ohio Casualty Ins. Co. v. National GeneralIns. Co. (Mar. 17, 1992), Mahoning App. No. 91 CA 6, unreported (coverage allowed due to mutual purpose between mother and daughter. The mother had taken team members to a softball game on prior occasions, but suggested on the day of the accident that her daughter transport the team.)
Because White Allen did not expressly forbid use by second permittees, the benefit or mutual purpose exception could apply and could result in coverage under the policy. However, the facts do not show any benefit to either Combs or White Allen from Campbell's use of the Blazer. Under any possible view of the evidence, Campbell's use of the Blazer did not serve Combs. Had Campbell been driving Combs to work, or had he been on an errand for Combs, coverage might exist. However, these were not the facts. Furthermore, the benefit to White Allen is no more evident. Although Campbell worked on an assembly line manufacturing Blazers, the connection between Campbell's employment and any potential "benefit" to White Allen is simply too indirect. Moreover, while Campbell took the Blazer out for a "test-drive," he was not a customer of White Allen, nor did he have any interest in purchasing the vehicle. Consequently, the trial court correctly found that Campbell's use of the Blazer was not covered under White Allen's insurance policy.
As a final matter, we note that Dillard and Campbell have raised the application of R.C. 4509.101 and other unspecified portions of Ohio's financial responsibility laws. Specifically, Dillard and Campbell urge re-examination of West and its progeny in light of subsequent legislation which requires minimum levels of insurance for all vehicles operated in the State of Ohio. We reject this argument for several reasons. First, it was not raised in the trial court, nor was it separately argued in Appellants' Brief. Instead, the claim was mentioned first in the Reply Brief and was then discussed again during oral argument. However, even if the issue had been properly raised, we would find it without merit.
In Bob-Boyd Lincoln Mercury v. Hyatt (1987), 32 Ohio St.3d 300, the Ohio Supreme Court refused to hold that insurance policies must be modified to comply with the provisions of Ohio's Financial Responsibility Act. In this regard, the court stressed that:
 [t]he Ohio Act has as its object the protection of the public from financially irresponsible motorists who have proved unwilling or unable to satisfy a judgment arising from an automobile accident. The statute embodies a "one-bite" approach to achieving this purpose by permitting motorists the privilege of driving without any proof of financial responsibility until they incur an accident related judgment and fail to satisfy it within 30 days.
Id. at 303 (citation omitted. Emphasis in original). Based on this reasoning, the court found that a policy does not have to meet the financial responsibility requirements of R.C. 4905.01
until such time as it is "certified" as proof of financial responsibility. Up to the certification point, the policy terms, not the statute, control who is an insured. Id. at 304.
Additionally, the court discussed R.C. 4509.101, which provided that "[n]o person shall operate or permit the operation of a motor vehicle in this state, unless proof of financial responsibility is maintained with respect to the vehicle, or, in the case of a driver who is not the owner, with respect to his operation of that vehicle." Id. The policy in Bob-Boyd defined an insured, in pertinent part, as anyone who was required by law to be an insured while using a covered auto with the named insured's permission. Id. at 301. Factually, Bob-Boyd was an auto dealership, and one of its customers became involved in an accident while taking a test-drive. Based on these facts and the statute, the customer argued that he was "required by law" to be an insured because R.C. 4509.101 dictated that every owner or operator must maintain automobile liability insurance. However, the Ohio Supreme Court disagreed with this interpretation of the law. In particular, the court focused on the fact that R.C.4509.101 does not say every owner and operator has to maintain automobile liability insurance. Instead, it only requires "proof of financial responsibility." As the court pointed out, insurance is simply one of many ways this requirement can be satisfied. Id. at 305. Accordingly, the court held that the customer was not "required by law" to be an insured under the dealership's insurance policy when the customer used a dealer-owned auto. Id.
A similar rejection of the public policy argument occurred inCincinnati Ins. Co. v. Kramer (1993), 91 Ohio App.3d 528. InKramer, a second permittee drove a rental car with the permission of the first permittee, who was not the owner of the car. Under the relevant policy provisions, liability coverage was excluded unless the insured had permission from the owner to drive the car. Because the owner had not given permission, the second permittee's use was considered non-permissive and was excluded. As inBob-Boyd, a public policy argument was also made, based on the Financial Responsibility Act. However, the Hamilton County Court of Appeals rejected this argument, observing that "[c]ourts have the duty to `enforce the statute as written,' not to add or subtract provisions as circumstances change." Id. at 533 (citation omitted). See also, Windsor Ins. Co. v. Henry (Aug. 6, 1992), Franklin App. No. 92AP-173, unreported (holding that intra-family exclusion is valid and enforceable despite requirement in R.C. 4509.101 that "proof of financial responsibility be maintained). We agree with these courts that exclusions from coverage in policies of insurance do not violate the Financial Responsibility Act.
Finally, we note that although R.C. 4509.101 has been amended a number of times following the decision in Bob-Boyd, even the most recent version of the statute still refers only to "proof of financial responsibility." See, R.C. 4509.101(A). And, as before, the statute continues to authorize various methods of demonstrating financial responsibility in addition to automobile liability insurance. See, R.C. 4509.101(G)(1). Had the legislature been dissatisfied with existing interpretation of the Financial Responsibility Act, it could easily have changed R.C.4509.101 or other sections of the Act. Since the legislature has chosen not to do so, we see no reason why the West decision should be re-evaluated. We have no power to do so, in any event.
In view of the preceding discussion, the single assignment of error is overruled and the judgment of the trial court is affirmed.
FAIN, J., and YOUNG, J., concur.
Copies mailed to:
William D. Meily
Thomas M. Green
Gregory J. Berberich
Richard M. Hunt
Hon. David Gowdown